## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| John M. Brown, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 2:06-2777-PMD |
| v. | ) | |
| | ) | |
| Green Tree Financial Servicing | ) | **ORDER** |
| Corporation a/k/a Green Tree Services, | ) | |
| LLC; Green Tree Insurance Agency; and | ) | |
| American Bankers Life Assurance | ) | |
| Company of Florida, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court upon Defendant American Bankers Life Insurance Company of Florida's ("ABLAC") Motion for Partial Summary Judgment. For the reasons set forth herein, the court grants in part and denies in part ABLAC's motion.

### BACKGROUND

The facts, taken in the light most favorable to the non-moving party, are as follows:

On July 28, 1999, Plaintiff received an unsolicited phone call at his home from Green Tree Financial Servicing Corporation. The man who called Plaintiff that day was a loan officer named Charlie Cook. (Meir Dep. 13:25-14:9.) In an affidavit, Plaintiff stated that Cook "said he could get me a good rate to pay off all my other bills to pay off my house and I would only have one bill a month for less money than I was paying." (Pl.'s Aff. at 12.) Also in this affidavit, Plaintiff stated that Cook "said the loan would have insurance that would **pay off the loan** if I died or became disabled." (*Id*. at 13 (emphasis added).) The affidavit further states,

> Q.    Did you ask questions about the life and disability insurance?
> A.    Enough that he said if I died or got disabled the house would be paid for. That's all I really needed to ask. That's what I wanted to buy.

> Q.    What did he say the insurance would do if you died?
> A.    **Pay off the house**.
> Q.    Did you ask Mr. Cook what would happen if you became disabled?
> A.    **Same thing.  Pay off the house**.
> Q.    Would you have considered getting a loan from Green Tree if the insurance wouldn't have paid off the house?
> A.    I wouldn't have done it at all.

(*Id*. at 13-14 (emphasis added).)  Plaintiff also indicated that Cook said nothing about Plaintiff owing a "balloon payment" of over $40,000 at the end of the loan.  (*Id*. at 13.)

Cook then went to Plaintiff's house, where Plaintiff "remind[ed]" Cook that he could not read.  (*Id*. at 15.)  Plaintiff stated in his affidavit that he told Cook he could not read and that Cook would have to explain everything to Plaintiff and his wife, Ms. Brown.  (*Id*. at 16.)  When asked what Cook said about insurance, Plaintiff replied, "Same thing he said on the telephone."  (*Id*. at 17.)  According to Plaintiff, Cook again told him that the life and disability insurance would pay off the loan if Plaintiff died or became disabled.  (*Id*.)  The affidavit also states,

> Q.    Did Mr. Cook say how long you would be paying for the insurance?
> A.    I don't know if he said or I asked but he said I was going to be paying for the insurance for the whole twenty years.
> Q.    What did that mean to you?
> A.    It meant I had insurance for twenty years.
> Q.    Did you let Mr. Cook know that's what you thought he meant?
> A.    Yes because I said again so I'll have insurance for twenty years.
> Q.    Specifically, did Mr. Cook say anything about the insurance only being good for seven years?
> A.    No.  This I would have knowed [sic].

(*Id*. at 18.)  When asked whether saving money each month was the reason Plaintiff decided to take out the loan, he said, "No.  We mostly decided to take out the loan because of the insurance."  (*Id*. at 20.)[1]

---

[1]Although not of import for purposes of this motion, the court notes that Cook has denied that he indicated Plaintiff was purchasing disability insurance for the term of the loan and has

About a week after Mr. Cook visited Plaintiff's home, someone from the Green Tree office called to arrange Plaintiff and his wife coming to the office to sign the papers to get the loan. (*Id*.) In mid-August of 1999, Plaintiff and Ms. Brown went to Green Tree's offices. (*Id*. at 21.) Plaintiff indicated that he and Ms. Brown met with a young white man at Green Tree's office, and Plaintiff told this young man that he could not read and write and that the man would have to explain the papers to Plaintiff. (*Id*. at 23.) According to Plaintiff, the loan described by the young man was very different from the one described by Cook. (*Id*.) At this time, Plaintiff learned about the balloon payment, and he also asked this man about the insurance at issue in this case:

> Q.    Did you ask questions about the insurance that you were getting as part of the loan?
> A.    Yes we ask[ed] questions to be sure we were still getting the insurance Mr. Cook said we were supposed to get.
> Q.    What did the man say about the insurance?
> A.    He said we was [sic] getting the life and disability insurance to pay off the loan if I died or became disabled.
> Q.    Were you shown any paper about your insurance?
> A.    Yes.  He had a paper that he showed us that said we were getting "net payoff" insurance.

(*Id*. at 24.)  Plaintiff signed the loan documents that day at Green Tree's office. (*Id*. at 23.)

On May 31, 2003, Plaintiff was involved in a motor vehicle accident and became totally and permanently disabled. (Pl.'s Dep. 60:13-64:10.) On July 8, 2003, Plaintiff filed an application for disability benefits with ABLAC. (Pl.'s Dep. 62:4-62:14.)  Plaintiff sent in the appropriate paperwork, and ABLAC paid the loan payments to Green Tree until September 22, 2006. (Pl.'s Aff. at 28-30; *see also* Compl. ¶ 13.)  An examination of the loan documents reveals that Plaintiff and Ms. Brown signed a document indicating that the term of the credit life and credit disability

---

denied that he told Plaintiff the insurance would pay off the value of the loan.  (Cook Dep. 24:20-25:12; 29:15-31:16.)

insurance was 84 months.  (*See* Def.'s Mot. for Partial Summ. J. Ex. A.)  Plaintiff and Ms. Brown also specifically initialed on the Truth in Lending Statement next to the term of 84 months in the section concerning credit life insurance and credit disability insurance.  (*Id*.)  ABLAC paid Plaintiff's monthly loan payments through what was left of the 84-month period but thereafter refused to make the payments.

Plaintiff brought the instant suit on October 5, 2006, and amended his Complaint on October 16, 2007.  The causes of action listed in the Amended Complaint are as follows: (1) breach of contract; (2) violation of Home Owners Equity Protection Act (HOEPA); (3) fraud; (4) constructive fraud; (5) breach of fiduciary duty; (6) negligent misrepresentation; (7) violation of the unfair trade practices act; (8) unconscionability; and (9) temporary and permanent restraining order.  (*See* Am. Compl.)  The causes of action stated against ABLAC are breach of contract, fraud, constructive fraud, breach of fiduciary duty, negligent misrepresentation, and violation of the unfair trade practices act.  (*Id*.)

On February 19, 2008, ABLAC filed a Motion for Partial Summary Judgment.  ABLAC moves that Plaintiff's claims against ABLAC for fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA") be dismissed with prejudice.  ABLAC also requests that Plaintiff's claim against it for breach of contract be dismissed to the extent that it relates to the alleged misrepresentations regarding the term of the insurance policy at issue in this case.  (*See* Mem. in Supp. at 3.)  Plaintiff filed a Response in Opposition on March 13, 2008, to which ABLAC filed a Reply.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex*, 477 U.S. at 327.

## ANALYSIS

### A.    Fraud, Constructive Fraud, and Negligent Misrepresentation

ABLAC moves for summary judgment for several reasons, and the court will address each argument in turn. ABLAC first asserts that it is entitled to summary judgment on Plaintiff's claims against it for fraud, constructive fraud, and negligent misrepresentation because Plaintiff "could not

have reasonably relied upon the alleged misrepresentation[s] regarding the policy." (Mem. in Supp. at 7.)  ABLAC states that these three claims are based on the factual allegation that "GreenTree I and/or Agency (as ABLAC's agent) misrepresented to Plaintiff that the Policy would pay the remaining balance of the Loan should he die or become disabled during the Loan term." (*Id*. at 7-8.)  However, ABLAC asserts that even assuming Plaintiff can establish that misrepresentation, "Plaintiff's claims based upon this alleged misrepresentation fail as a matter of law because Plaintiff received, signed and specifically initialed documents stating that the term of the Policy was for only 84 months." (*Id*. at 8.)  ABLAC states, "South Carolina law provides that anyone who signs a contract or other written document is bound by the terms and conditions of the writing, and, if the person cannot read, he has the affirmative duty to ask someone to read the document to him." (*Id*.)  According to ABLAC, Plaintiff cannot establish reasonable reliance upon the alleged misstatment regarding the policy because the document specifically stated the term of the policy was for 84 months and that as a result, Plaintiff's claims for fraud, constructive fraud, and negligent misrepresentation fail.

In order to state a cause of action for fraud, Plaintiff must establish "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity; (5) his intent that it should be acted upon by the person; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Mutual Sav. & Loan Ass'n v. McKenzie*, 274 S.C. 630, 633, 266 S.E.2d 423, 425 (1980).  "'To establish constructive fraud, all elements of actual fraud except the element of intent must be established.'" *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 333, 574 S.E.2d 502, 509 (Ct. App. 2002) (quoting *Ardis v. Cox*, 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct. App. 1993)).  Furthermore, to establish liability for

6

negligent misrepresentation, Plaintiff must show "'(1) the defendant made a false representation to

the plaintiff; (2) the defendant had a pecuniary interest in making the representation; (3) the

defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4)

the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied

on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his

reliance upon the representation.'" *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 407, 581 S.E.2d

161, 166 (2003) (quoting *AMA Mgmt. Corp. v. Strasburger*, 309 S.C. 213, 420 S.E.2d 868 (Ct. App.

1992)).

 ABLAC argues that these three causes of action fail because Plaintiff cannot establish the

right to rely on the alleged misstatement that the policy would pay the remaining balance of the loan

if Plaintiff should die or become disabled during the term of the loan or that Plaintiff's reliance on

such misstatement was justifiable. ABLAC relies on the fact that Plaintiff "received, signed and

specifically initialed documents stating that the term of the Policy was for only 84 months." (Mem.

in Supp. at 8.)[2] In a 2003 opinion, the Court of Appeals of South Carolina stated,

> The right to rely must be determined in light of the plaintiff's duty to use reasonable
> prudence and diligence under the circumstances in identifying the truth with respect
> to the representations made to him. Moreover, there is no right to rely, as required
> to establish fraud, where there is no confidential or fiduciary relationship and there
> is an arm's length transaction between mature, educated people. This is especially
> true in circumstances where one should have utilized precaution and protection to
> safeguard his interests. The principle of the right of reliance upon representations

---

[2]It is interesting to note that while Plaintiff did initial next to the 84-month term in the
Truth in Lending Statement, the fact that the term of the disability insurance was 84 months does
not necessarily refute Plaintiff's claim that he was told his house would be *paid off* if he became
disabled. Plaintiff did in fact become disabled during the 84-month period, and although
monthly payments were made, his house was not paid off as he expected. While it likely exists,
ABLAC has not pointed to a document signed by Plaintiff that indicates he agreed only that
payments would be made during the 84-month term.

is closely bound up with a duty on the part of the plaintiff to use some measure of protection and precaution to safeguard his own interest. *Thomas v. Am. Workmen*, 197 S.C. 178, 182, 14 S.E.2d 886, 888 (1941).

It is largely because the law of fraud requires [a claimant] to prove his ignorance of the falsity of the representation and his right to rely on the falsity that the courts long ago established the rule that ordinarily one cannot complain of fraud in the misrepresentation of the contents of a written instrument signed by him when the truth could have been ascertained by reading the instrument, and that one entering into a written contract must read it and avail himself of every reasonable opportunity to understand its content and meaning. *PPG Indus., Inc. v. Orangeburg Paint & Decorating Ctr., Inc.*, 297 S.C. 176, 180, 375 S.E.2d 331, 333 (Ct. App. 1988).

*Regions Bank v. Schmauch*, 354 S.C. 648, 672-73, 582 S.E.2d 432, 445 (Ct. App. 2002) (some internal citations omitted). The court in *Regions Bank* also noted the general rule that "[a] person who signs a contract or other written document cannot avoid the effect of the document by claiming he did not read it." *Id.* at 663, 582 S.E.2d at 440. Indeed, every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it. *Burwell v. S.C. Nat'l Bank*, 288 S.C. 34, 39, 340 S.E.2d 786, 789 (1986).

Plaintiff does not appear to take issue with this general rule, and Plaintiff acknowledges he initialed next to the 84-month term for insurance. He argues, however, that his claims for fraud, constructive fraud, and negligent misrepresentation are not barred because there is an exception for the ignorant and unwary. Plaintiff states,

The Defendant cites [cases] for what [it] contend[s] is the "firmly established" principle that **ordinarily** one who signs a written instrument has the duty to exercise reasonable care to protect himself and make sure of its contents. The word "ordinarily" suggests there might be an exception to the rule. . . . Recently the South Carolina Supreme Court simply held, "a person **who can read** is bound to read an agreement before signing it." (Emphasis added). <u>Munoz v. Green Tree Financial Corp.</u>, 542 S.E.2d 360 (S.C. 2001). It is also firmly established in South Carolina law that the failure of a party who is ignorant and unwary to read a contract or have it read to him may be excused. While it may be true that this exception is "strictly construed," the illiterate Plaintiff born into poverty, with limited intellectual capacity, who remarkably has struggled his whole li[f]e to provide for his family,

8

aptly fits the description.

(Resp. in Opp'n at 22-23 (some citations omitted).)  Indeed, in *Regions Bank*, the court stated that

the general rule "is subject to the exception that if the party is ignorant and unwary, his failure to

read the document may be excused."  *Regions Bank*, 354 S.C. at 664, 582 S.E.2d at 440.  The

exception is "strictly construe[d]," and "[i]n determining whether a party can be classified as

ignorant and unwary, an individual's education, business experience and intelligence are all

considered."  *Id*. at 664, 582 S.E.2d at 440.

In the case *sub judice*, there is evidence that Plaintiff is illiterate, and although Plaintiff

attended school until he was sixteen, he only reached the third grade. (Pl.'s Dep. 12:5-12:16; 14:15-

15:6.)  While he generally cannot write, he is able to write his name.  (Pl.'s Aff. at 3.)  Plaintiff is

not "real good" with numbers but can make small change.  (*Id*.)[3]  After he left school, he took a job

with his sister's husband to work as a carpenter's helper.  (*Id*. at 4.)  He had other jobs in

construction, and he was able to obtain his driver's license through an oral test.  (*Id*.)  Plaintiff has

never had a job that required him to write things down or fill out paperwork, and the closest he ever

came to owning his own business was working with his brother Vernon doing siding work.  (*Id*.)

Plaintiff stated that Vernon "knew how to figure the stuff."  (*Id*.)  Although Ms. Brown can read

better than Plaintiff, she only made it to fifth or sixth grade.  (Pl.'s Dep. 16:25-17:9.)

Plaintiff also presented evidence that he earned the money and his wife, Ms. Brown, paid the

bills.  (Pl.'s Aff. at 5.)  Until they got a bank account in the 1970s, they paid their bills either in cash

or via money orders they purchased.  (*Id*. at 5-6.)  Although Plaintiff would sometimes sign the

---

[3]In his Response in Opposition, Plaintiff asserts his IQ is 73 and thus falls "within the
borderline range in the third (3rd) percentile for his age group."  (Resp. in Opp'n at 2.)  The
court has been unable to locate this evidence, however.

checks, he did so when they were already filled out for him.  (*Id*. at 6.)  Plaintiff stated in his affidavit that if he wanted to buy a car, he just "bought junker cars and paid cash."  (*Id*.)  Plaintiff indicated that he got a credit card about five years ago that, after his wife showed him how, he now uses it to purchase gas.  (*Id*. at 7.)  Plaintiff and his wife, along with his daughter and son-in-law, purchased some land from a man named Mr. Ackerman approximately sixteen years ago. (*Id*.)  He stated that he did not sign any papers to buy this land–his daughter and her husband did.  (*Id*.) Plaintiff then bought a trailer from Sangaree Mobile Homes in Summerville, and he had to sign some papers to make this purchase.  (*Id*. at 8.)  Plaintiff told the salesman at Sangaree that he could not read, and the salesman told him "what the deal was, what the payment was."  (*Id*.)  When Plaintiff had to borrow money from loan companies, he told the people there that he could not read. Plaintiff states that he "ask[ed] them to explain them [(the loan papers)] to me and they'd explain it to me."  (*Id*. at 9.)

According to ABLAC, "Plaintiff's alleged illiteracy does not create a factual issue as to whether his reliance upon the alleged misstatement was reasonable."  (Mem. in Supp. at 10.) ABLAC states, "Plaintiff cannot meet the exception as a matter of law because Plaintiff has testified that he has substantial experience in business transactions of the type at issue in this case."  (*Id*.) Defendant ABLAC points to the following testimony from Plaintiff's deposition:

> Q.    But you signed similar documents [to the documents at issue] before, correct?
> A.    Right.
> Q.    For other loans?  So this wasn't anything new, going in and signing documents?
> A.    It wasn't nothing new.
> Q.    You've been doing it your whole life?
> A.    Yeah.  This is the only time it worked out the way it worked out.

(Pl.'s Dep. 114:3-114:11.)   Plaintiff also deposed that when he bought car insurance and

homeowner's insurance, he knew it was only for a certain period of time.  (Pl.'s Dep. 94:20-95:2.)[4]

ABLAC states, "Ultimately, if the Policy documents Plaintiff executed did not reflect his understanding of the coverage terms, that is the result of Plaintiff's total failure to exercise due care to ensure that he understood the content of what he was signing."  (Mem. in Supp. at 12.)  ABLAC also points to the following from Plaintiff's deposition testimony:

> Q.     So if you sign a document that you don't have someone read to you, you're taking a chance that you don't–that you don't actually agree to what's on the document?
> A.     Yes, I reckon so.
> Q.     Do you normally have someone read documents to you before you sign them?
> A.     No.
> Q.     At this closing back in 1999, you could have asked someone to read the documents to you, right?
> A.     I could have probably carried somebody with me to do it.
> Q.     Or you could have asked the other people in the room, like the gentleman that was at the closing, you could have asked him, right?
> A.     I reckon I could have.
> Q.     But you didn't?
> A.     I didn't.
> Q.     And he never told you, no, I won't read the document to you?
> A.     No, he didn't.

(Pl.'s Dep. 110:13-111:9.)

Considering the evidence in the light most favorable to Plaintiff, the court concludes a jury could determine that Plaintiff had the right to rely upon the alleged misrepresentations at issue. "'The general rule is that questions concerning reliance and its reasonableness are factual questions for the jury.'" *Redwend Ltd. P'ship v. Edwards*, 354 S.C. 459, 475, 581 S.E.2d 496, 504 (Ct. App. 2003) (quoting *Unlimited Servs., Inc. v. Macklen Enters., Inc.*, 303 S.C. 384, 387, 401 S.E.2d 153, 155 (1991)).  Furthermore, in *Thomas v. American Workmen*, 197 S.C. 178, 14 S.E.2d 886 (1941),

---

[4]He indicated that he knew the insurance lasted only for a period of time because the insurance company told him that.  (Pl.'s Dep. 95:3-95:6.)

the Supreme Court of South Carolina stated,

> Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties.

*Thomas*, 14 S.E.2d at 888; *see also Elders v. Parker*, 286 S.C. 228, 233, 332 S.E.2d 563, 567 (Ct. App. 1985) ("Whether reliance is justified in a given situation requires an evaluation of the circumstances involved, including the positions and relations of the parties.").

ABLAC cites *Maw v. McAlister*, 252 S.C. 280, 166 S.E.2d 203 (1969), to support its position. In that case, the defendant appealed from a judgment in favor of the plaintiff, arguing an "Agreement and Release" executed by the plaintiff served as a bar to his tort action. *Maw*, 252 S.C. at 284, 166 S.E.2d at 204. The agreement at issue, "by its unambiguous terms, released and discharged defendants from all liability to plaintiff arising out of the collision." *Id*. at 284, 166 S.E.2d at 204. The plaintiff argued the writing should not bar his action because he alleged "that he had been induced to sign the agreement by the fraud and deceit of the carrier's agent, who falsely represented to him that the release which he was requested to sign related only to his claim for property damage and did not affect his claim for personal injury." *Id*. at 284, 166 S.E.2d at 204. The Supreme Court of South Carolina concluded the lower court should have granted the defendant's motion for a directed verdict and stated,

> Plaintiff's attempt to bring himself within the exception to the rule by testimony that he cannot read must fail. The record conclusively establishes that he is a person of intelligence and above average experience. He offers no excuse for his signing the agreement without having it read to him except his statement that he had complete confidence in the insurance adjuster.

12

*Id*. at 286, 166 S.E.2d at 205.

The plaintiff in *Maw* was forty-three, had worked in the same textile plant for twenty years, and owned and operated a grocery store.  *Id*. at 286, 166 S.E.2d at 205.  The plaintiff was also "an experienced, large scale broiler producer," having substantially increased the capacity of his broiler plant and automating it shortly before the accident.  *Id*. at 286, 166 S.E.2d at 205.  It was conceded the plaintiff attended school to the eighth grade, and his wife testified he was unable to read and that she customarily read business correspondence and documents to him.  *Id*. at 286-87, 166 S.E.2d at 205.  The court noted, however, that on cross-examination the plaintiff "demonstrated his ability to read figures by reading the figures $265.50, $15.50, and $2,000.00 from the agreement in question." *Id*. at 287, 166 S.E.2d at 205.  The release at issue was signed at the plaintiff's home nineteen days after the accident, and he knew "that the insurance adjuster who presented the release, a stranger to him, represented the tort feasor's insurance carrier."  *Id*. at 287, 166 S.E.2d at 205-06.  The adjuster wanted the plaintiff's wife to sign the instrument, as some money was included for her therein, and when she did, the adjuster folded the paper down from the top so that she could not read it.  *Id*. at 287, 166 S.E.2d at 206.  When plaintiff's sister-in-law witnessed the document, the adjuster told her that it was simply a truck release, and the paper was turned down so that she could not read it.  *Id*. at 288, 166 S.E.2d at 206.  The court stated,

> Plaintiff, a mature, experienced businessman, was under no disadvantage in dealing with a stranger whom he knew to represent adverse parties.  He had no right to rely upon the adjuster's representation as to the contents of the writing.  It was his duty to avail himself of the means at hand to discover the truth.  He could easily have done so by having his wife read the paper for him as she was wont to do.  In fact, a casual inspection of the paper by plaintiff himself would have revealed to him the inclusion of figures which belied the adjuster's representation as to the nature of the instrument.
> In spite of suspicious circumstances attending the execution and witnessing of the document, plaintiff completely disregarded his duty to look out for his own

interest. He does not even claim that his omission resulted from his inability to read. Instead, he says that he had implicit confidence in the adjuster. Without any circumstances of compulsion, plaintiff, in effect, shut his eyes and took a chance on a stranger representing adverse interests. Under the decisions of this court which have been cited, such conscious or reckless disregard of his duty must be held to bar plaintiff's claimed right to rescind the agreement in question for fraud.

*Id*. at 288-89, 166 S.E.2d at 206-07.

The case *sub judice* is distinguishable from *Maw*, and there are certainly factors in the record sufficient for a jury to find reliance was reasonable. Plaintiff is illiterate, and both Mr. Cook and the "young man" at the closing knew Plaintiff could not read. While ABLAC asserts Plaintiff cannot rely on his illiteracy alone, (*see* Reply at 2), the court does not decide this issue as there is no need to rely on illiteracy alone.[5] Plaintiff has presented evidence that he *specifically told* Cook that Cook would have to explain everything and that he told the young man at the closing the same thing. Unlike in *Maw*, there is thus some evidence that Plaintiff was trying to look out for his own interests. In addition, Plaintiff is sixty-one years old, his education is extremely limited, and to date he has relied on his wife and the honesty of others in conducting his personal business. Plaintiff in

---

[5]ABLAC points to a statement made by the court in its order dated February 28, 2008, in ruling on Defendant Green Tree's Motion to Compel. The court stated, "even though Plaintiff is illiterate, he is 'bound to have the paper read to him before signing, just as a person who can read is bound to read before signing it.'" (Order at 8 (quoting *Baldwin v. Postal Tel. Cable Co.*, 78 S.C. 419, 59 S.E. 67, 68 (1907).) This statement must be put into context of the motion, however and should not be interpreted as indicating that Plaintiff has no cause of action for fraud whatsoever. Rather, the court made this statement in determining whether the holding of *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), required the court to send Plaintiff's claims against Green Tree to arbitration. In the same paragraph referenced by ABLAC, the court noted that Plaintiff's illiteracy "did not prevent him from only reading the arbitration clause" and that Plaintiff's assertion of fraud "has nothing to do with the arbitration agreement itself." (Order at 8-9.) As a result, the court granted Green Tree's Motion to Compel Arbitration. The issue the court confronted in ruling on the Motion to Compel is different from the issue before the court today, and even Green Tree's counsel recognized that the exception for the "ignorant and unwary" could be applicable in the context of determining justifiable reliance on a fraud claim. (*See* Green Tree's Resp. in Opp'n to Pl.'s Motion to Alter at 4.)

14

this case is simply not as well-educated as the third-party plaintiff in *DeHart v. Dodge City of Spartanburg, Inc.*, 311 S.C. 135, 427 S.E.2d 720 (Ct. App. 1993), who had a college degree in elementary education.  Plaintiff does not own his own business as the plaintiff in *Maw* did, and although his wife can read better than he can, there is evidence that she cannot read well either. ABLAC points out that Plaintiff has entered into other business transactions, but Plaintiff presented evidence that for the other contracts he has signed, he had to rely on the salesman's explanation of the terms of the contract.  He indicates he was aware other insurance expired after a certain period of time because the salesman told him so.  While ABLAC attempts to show that Plaintiff is experienced at entering into the type of transaction at issue in the case *sub judice*, the court concludes a jury could certainly conclude otherwise.  It is therefore the province of the jury, not this court, to determine whether Plaintiff's reliance was reasonable.  *See Redwend Ltd. P'ship*, 354 S.C. at 475, 581 S.E.2d at 504; *Brown v. Stewart*, 348 S.C. 33, 44-45, 557 S.E.2d 676, 682 (Ct. App. 2001) (concluding there was a jury question presented as to the legitimacy of the plaintiff's right of reliance because, *inter alia*, although the defendants presented one balance sheet to the plaintiff which indicated some loans had been made to the corporation, they simultaneously told him that they each invested $25,000 and were seeking additional capital to finance their expansion). ABLAC's Motion for Partial Summary Judgment is thus denied with respect to Plaintiff's claims for fraud, constructive fraud, and negligent misrepresentation.

**B.     Breach of Fiduciary Duty**

ABLAC moves for partial summary judgment with respect to Plaintiff's claim that ABLAC breached its fiduciary duty towards Plaintiff.  ABLAC states, "Plaintiff's claim for breach of fiduciary duty . . . fails to state a claim upon which relief can be granted because the allegations of

the Amended Complaint, even if taken as true, do not establish a fiduciary relationship between

ABLAC and Plaintiff." (Mem. in Supp. at 13.) ABLAC asserts that under South Carolina law, an

insurer such as ABLAC does not stand in a fiduciary relationship with the insured, and "while

Plaintiff's claim for breach of fiduciary duty is based upon GreenTree I and/or Agency's alleged

misstatements in offering the Policy for sale, South Carolina case law clearly establishes that the sale

of insurance is an arm's length commercial transaction, which does not give rise to a fiduciary

relationship." (*Id*. (internal quotation marks and citation omitted).)

        In Response, Plaintiff asserts the existence of a fiduciary relationship between Plaintiff and

ABLAC's agents is a question of fact. (Resp. in Opp'n at 24.) Plaintiff states,

> The duty which the Plaintiff alleges was imposed on the Defendant's agents was an
> express or implied duty to truthfully disclose the terms of the credit life and disability
> insurance to the Plaintiff they knew was illiterate. The Plaintiff is not particularly
> concerned whether the particular cause of action for breach of fiduciary duty is
> sustained, but rather that the duty to disclose[] not be foreclosed by summary
> judgment because a false representation can also arise from the failure to disclose a
> material fact when there is a duty to disclose. Gardner v. Nash, 82 S.E.2d 123 (S.C.
> 1954).

(*Id*. at 25.) Plaintiff asserts there are three ways a duty to disclose can arise and that a jury could

find ABLAC and its agents had a duty to disclose in all three of these circumstances. Plaintiff states,

> Viewing the evidence in the light most favorably to the Plaintiff, there is
> evidence from which the jury could reasonably find that the Defendant's agents
> breached the duty of good faith disclosure expressly accepted by them, imposed upon
> them by reason of their conduct and the relative positions of the parties, and
> statutorily imposed upon them b[y] State and Federal law and by reason of the
> transaction they were involved in its essential nature being intrinsically fiduciary and
> necessarily calling for good faith and disclosure.

(*Id*. at 28-29.)

        Plaintiff is incorrect in his assertion that the existence of a fiduciary relationship is a question

of fact for the jury. In *Hendricks v. Clemson University*, 353 S.C. 449, 578 S.E.2d 711 (2003), the

16

Supreme Court of South Carolina explained that "[a]lthough whether a fiduciary relationship has been breached can be a question for the jury, the question of whether one should be imposed between two classes of people is a question for the court." *Hendricks*, 353 S.C. at 459, 578 S.E.2d at 715. The court declined to recognize the relationship between advisor and student as a fiduciary one, stating, "Historically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters." *Id*. at 459, 578 S.E.2d at 716.

While Plaintiff spends much time discussing a duty to disclose and when it may arise, Plaintiff has skipped a step in the analysis. Instead of discussing whether a fiduciary relationship exists at all, Plaintiff simply jumps into the analysis of whether ABLAC had a duty to disclose certain information. However, the court must first determine a fiduciary relationship exists before it assesses the duties that go along with such a relationship.[6]

The court concludes that ABLAC is entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty. As ABLAC asserts, a fiduciary relationship "cannot rest upon the mere relationship of insurer and insured." *Moses v. Mfrs. Life Ins. Co.*, 298 F. Supp. 321, 323 (D.S.C. 1968). Indeed, the plaintiff in *Pitts v. Jackson National Life Insurance Co.*, 352 S.C. 319, 574 S.E.2d 502 (Ct. App. 2002), made an argument similar to Plaintiff's, arguing that Jackson National

---

[6]Plaintiff cites several cases for the proposition that duty to disclose arose in the case *sub judice*. *Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006), however, did not involve a cause of action for breach of fiduciary duty. The court discussed the duty to disclose in the context of a claim for violation of the SCUTPA. *See Wright*, 372 S.C. at 25, 640 S.E.2d at 499. Likewise, in *Kiriakides v. Atlas Food Systems & Services, Inc.*, 338 S.C. 572, 527 S.E.2d 371 (Ct. App. 2000), the complaint sought judicial dissolution, an accounting, and damages for fraud. *Kiriakides*, 338 S.C. at 579, 527 S.E.2d at 375. Because the court concludes Plaintiff has not established a fiduciary relationship, the court will not opine on the extent of duties that may or may not have been owed to Plaintiff.

had a fiduciary duty "to provide complete and truthful information" to him and that "it breached that duty when it failed to make full disclosure with respect to the type of policies available, the charges, commissions, mortality costs and other expenses associated with those policies." *Pitts*, 352 S.C. at 329, 574 S.E.2d at 507. The Court of Appeals of South Carolina stated,

> Although the relationship between an insurer and an insured has at times been characterized as "special," this has occurred only after the parties have entered into a mutually binding contract for insurance, specifically in the posture of an insured's claim of bad faith refusal to pay benefits due under an insurance contract. The conduct at issue in these cases arose based on the insurer's established contractual obligations.
> This case, however, requires us to review the context of an insurer/insured relationship from its inception, specifically, at the point of the application for insurance. Our research reveals no South Carolina case, and the parties have cited none, which establishes a fiduciary relationship at the application stage. In fact, our Supreme Court has found an applicant for an insurance policy does not stand in a fiduciary relationship with the insurer. *Gordon v. Fidelity & Cas. Co. of N.Y.*, 238 S.C. 438, 120 S.E.2d 509 (1961) (finding no relationship of trust and confidence existed between the insurance applicant and the insurance agent); *O'Connor v. Bhd. of R.R. Trainmen*, 217 S.C. 442, 60 S.E.2d 884 (1950) (holding no relation of trust and confidence existed between the insurance applicant and the soliciting agent where they had not known each other prior to the transaction and the agent did nothing in preventing the applicant from reading the application).

*Id*. at 331, 574 S.E.2d at 507-08 (some internal citations omitted). The court further stated that the sale of insurance "is an arm's length commercial transaction, which does not give rise to a fiduciary relationship." *Id*. at 331, 574 S.E.2d at 508. Because the court concludes there was no fiduciary relationship in this case, the court grants ABLAC's Motion for Partial Summary Judgment on this claim.

**C.     Violation of the South Carolina Unfair Trade Practices Act**

ABLAC moves for summary judgment on Plaintiff's claim for violation of the SCUTPA, asserting this claim fails as a matter of law because the "alleged unfair trade practices regarding the business of insurance are exempt from the SCUTPA." (Mem. in Supp. at 14.) In his Response,

18

Plaintiff "concedes the Defendant's argument and withdraws his cause of action for violation of the South Carolina Unfair Trade Practices Act." (Resp. in Opp'n at 29.) Because Plaintiff concedes ABLAC is correct, the court grants ABLAC's Motion for Partial Summary Judgment on Plaintiff's claim for violation of the SCUTPA.

**D.    Breach of Contract**

ABLAC moves for summary judgment on Plaintiff's claim for breach of contract, asserting this claim should be dismissed "as a matter of law to the extent that it is based upon ABLAC's alleged misrepresentation of the policy terms or termination of policy benefits on September 22, 2006." (Mem. in Supp. at 15.) ABLAC asserts that Plaintiff does not allege that ABLAC breached the terms of the written contract but instead "offers parol evidence of alleged representations by Cook in support of his claim that ABLAC breached an oral agreement that the policy would extend for the full term of the loan." (*Id.*) ABLAC asserts the parol evidence rule prevents Plaintiff from using allegations regarding Cook's alleged misrepresentations to contradict the terms of the written documents. (*Id.*)

In Response, Plaintiff argues that parol evidence is "freely admitted to establish allegations of fraud." (Resp. in Opp'n at 29.) Plaintiff also asserts that even in the absence of allegations of fraud, "the parol[] evidence rule would not apply because the only written documents the Plaintiff was given said two different things." (*Id.* at 30.) Plaintiff states, "The Plaintiff was told he was buying 'net payoff' credit insurance, shown and given a computer printout that said his coverage type was 'net payoff.'" (*Id.*)

ABLAC readily acknowledges that parol evidence is competent to prove fraud. (Reply at 4.) Indeed, in *Slack v. James*, 364 S.C. 609, 614 S.E.2d 636 (2005), the Supreme Court of South

Carolina stated that "[n]either the parol evidence rule nor a merger clause in a contract prevents one from proceeding on tort theories of negligent misrepresentation and fraud." *Slack*, 364 S.C. at 616, 614 S.E.2d at 640. However, the court also stated that "breach of contract claims based on pre-contract statements or representations are precluded by the parol evidence rule." *Id*. at 616 n.3, 614 S.E.2d at 640 n.3; *see also Gilliland v. Elmwood Props.*, 301 S.C. 295, 302, 391 S.E.2d 577, 581 (1990) (holding that the parol evidence rule did not prevent Elmwood from proceeding on its negligent misrepresentation theory but that Elmwood's breach of contract counterclaims were precluded by the parol evidence rule). The court thus concludes that the parol evidence rule prevents Plaintiff from using allegations regarding Cook's alleged misrepresentations to contradict the terms of the written documents.

Furthermore, to the extent Plaintiff argues the parol evidence rule does not apply because the documents "said two different things," (Resp. in Opp'n at 30), the court disagrees. Plaintiff points to an exhibit marked Green Tree Bates Stamped Document No. 20. This document states that the "coverage type" is "net payoff" and that the "life term" and "disability term" are both "84." It appears this document is referring to the "credit life" insurance, and in examining a copy of the policy Plaintiff provided as Exhibit N, it appears Plaintiff did receive "net payoff" life insurance but that there was no such "net payoff" disability insurance. (*See* Resp. in Opp'n Ex. N.) The court also agrees with ABLAC that "to argue that Plaintiff was misled in reliance upon the computer printout is disingenuous" given that Plaintiff's main argument in opposing the motion is that he is unable to read. (Reply at 5.)

Because the court finds no ambiguity, and because that the parol evidence rule prevents Plaintiff from using allegations regarding Cook's alleged misrepresentations to contradict the terms

20

of the written documents, the court grants ABLAC's Motion for Partial Summary Judgment on Plaintiff's breach of contract claim to the extent that it is based upon ABLAC's alleged misrepresentation of the policy terms or termination of policy benefits on September 22, 2006.

## E.     Statute of Limitations

ABLAC asserts that "Plaintiff's claims against ABLAC for fraud, constructive fraud, negligent misrepresentation, [breach of] fiduciary duty, violation of SCUTPA and breach of contract (to the extent based upon alleged early termination of benefits) should also be dismissed because Plaintiff failed to bring them within the three-year statute of limitations." (Mem. in Supp. at 16.) ABLAC asserts that the statute of limitations for actions based upon an alleged misrepresentation is governed by the "discovery rule" and that the statute "begins to run upon discovery of the misrepresentation itself or of such facts as would have led to the knowledge thereof, if pursued with reasonable diligence." (*Id.* (internal quotation marks omitted).) ABLAC states, "The test of whether a person should have known of the operative facts is objective, rather than subjective." (*Id.*) ABLAC asserts that Plaintiff "clearly had notice regarding any claim relating to the term of coverage as of his receipt of the February 2000 Letter, which enclosed the Policy certificate setting forth the 84-month Policy term and expiration date." (*Id.*) Because Plaintiff did not bring this action until October of 2006, ABLAC argues it is barred by the statute of limitations.

In Response, Plaintiff states there is no evidence he learned to read in between the time of the closing and February 27, 2000, the date of the letter. (Resp. in Opp'n at 30.) Plaintiff states, "The Defendant does not contend that the illiterate knew or should have known that his credit insurance was only good for seven (7) years based upon this letter. They contend that the Plaintiff's wife, who got as far as sixth grade, can read a little, testified she usually opens the mail." (*Id.* at 31.)

21

Plaintiff's wife deposed, however, that she did not recall receiving or sending any letters or otherwise communicating with either the lender or the insurance company between the time of the closing and the time Plaintiff was injured. (Linda Brown Dep. 35:18-36:15; *see also* Pl.'s Aff. at 27-28.) Plaintiff continues, "Whether or not the Plaintiff[] received the letter in question[] and the attachments, there is no evidence the illiterate Plaintiff received it or knew what it said." (Resp. in Opp'n at 32.) Plaintiff asserts he did not learn the insurance was only good for seven years until he received a letter from Green Tree on October 6, 2003.

Contained in the record is a letter dated February 27, 2000, addressed to Plaintiff. (*See* Mem. in Supp. Ex. B.) This letter states in part,

> A recent audit of your loan file revealed that we did not receive a signed application for the Credit Life Insurance that you selected for your account at the loan closing. Please review the coverage information detailed on the certificate and notify us immediately of any corrections or changes to the coverage we have outlined.

> In order to complete your loan file please sign the enclosed duplicate application and return to our office within **15 days** of receipt of this letter. A postage paid return envelope has been enclosed for your convenience. If you choose not to respond, coverage will continue on your account as outlined in the Certificate of Insurance.

(*Id.*) The second page, entitled "Schedule," lists the term of disability insurance as 84 months, but it also contains a handwritten note at the bottom of the page that is impossible to read, with the exception of the last line that appears to read, "Please sign application." (*Id.*) The third page contains questions regarding health, which remain unanswered, and a signature block. The signature block is completely obscured, and Plaintiff deposed that he could not identify that signature as his own. (Pl.'s Dep. 57:7-58:2.) Neither did Plaintiff's wife identify that signature as Plaintiff's. (Linda Brown Dep. 35:5-35:17.)

Although there is evidence that the February 27, 2000 letter was properly addressed, there

22

is also evidence that Plaintiff and his wife did not receive it.  ABLAC points out, however, that

Plaintiff made an allegation in his Amended Complaint that indicates he did receive this letter.  In

his Amended Complaint, Plaintiff alleges that

> Six (6) months after the closing American Bankers, its agents or employees, sent the
> illiterate Plaintiff a letter advising they had not received an insurance application
> which letter contained a handwritten note advising the Plaintiff not to answer the
> questions but just to sign the paper and return it to the agent.

(Am. Compl. ¶ 17.)

In South Carolina, "the statue of limitations for causes of action for fraud is governed by the

'discovery rule,' and does not begin to run until discovery of the fraud itself or of 'such facts as

would have led to the knowledge thereof, if pursued with reasonable diligence.'" *Burgess v.*

*American Cancer Soc'y, S.C. Div., Inc.*, 300 S.C. 182, 185, 386 S.E.2d 798, 799 (Ct. App. 1989)

(quoting *Grayson v. Fidelity Life Ins. Co. of Philadelphia*, 114 S.C. 130, 135, 103 S.E. 477 (1920)).

The Court of Appeals of South Carolina further stated that in applying this rule, the "inquiry is

focused upon whether the complaining party acquired knowledge of any existing facts 'sufficient

to put said party on inquiry which, if developed, will disclose the alleged fraud.'" *Id.* at 185, 386

S.E.2d at 799 (quoting *Walter J. Klein Co. v. Kneece*, 239 S.C. 478, 123 S.E.2d 870 (1962)).  "The

test of whether a person should have known the operative facts is objective, rather than subjective."

*Berry v. McLeod*, 328 S.C. 435, 445, 492 S.E.2d 794, 799 (Ct. App. 1997) (citing *Burgess*, 300 S.C.

182, 386 S.E.2d 798).  The statute of limitations begins to run at the time the individual has either

inquiry or constructive notice.  *Id.* at 445, 492 S.E.2d at 800 (citing *Fuller-Ahrens v. S.C. Dep't of*

*Highways and Pub. Transp.*, 311 S.C. 177, 427 S.E.2d 920 (Ct. App. 1993)).

In the case *sub judice*, the court notes there is evidence that Plaintiff never received the letter

of February 27, 2000, but he did allege in his Amended Complaint that he received a letter

23

approximately six months after the loan closing.  The court need not be too concerned with this differing evidence and what ABLAC asserts is an admission because even if the February 2000 letter put Plaintiff on notice that the disability insurance had a term of eighty-four months, this does not put him on notice that the loan would not be *paid off* if he became disabled during the period of insurance.  Plaintiff did in fact become disabled during that eighty-four month period, and his loan was not paid off.  After Plaintiff was in a car accident, and after Plaintiff submitted a request for payment pursuant to the policy, he received a "Correction Form" from ABLAC via a letter dated October 6, 2003.  Plaintiff filed his suit on October 5, 2006, within the statute of limitations.  The court therefore denies ABLAC's Motion for Partial Summary Judgment on the ground that Plaintiff's claims are barred by the statute of limitations.

<u>**CONCLUSION**</u>

It is therefore **ORDERED**, for the foregoing reasons, that ABLAC's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the court grants ABLAC's Motion for Partial Summary Judgment on Plaintiff's claims for breach of fiduciary duty, violation of the SCUTPA, and breach of contract to the extent that it is based upon ABLAC's alleged misrepresentation of the policy terms or termination of policy benefits on September 22, 2006. The court denies ABLAC's Motion for Partial Summary Judgment on Plaintiff's claims for fraud, constructive fraud, and negligent misrepresentation.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**May 19, 2008**